No. 2961.

H. H. MOORE, A. H. LEHMAN AND A. J. DOWING v. THE STATE.

1. ASSAULT WITH INTENT TO MURDER.—CHARGE OF THE COURT.—An assault and a specific intent to kill are elements which must concur to constitute the offense of assault with intent to murder. Charge of the court, therefore, which, in defining assault with intent to murder, extended the intent to "do such serious bodily injury as would probably end in death" was fundamentally erroneous.

2. SAME.—MANSLAUGHTER.—See the statement of the case for evidence held to demand of the trial court an instruction upon the issue of manslaughter; wherefore the refusal of a proper charge upon the subject, requested by the accused, was error.

APPEAL from the District Court of Colorado. Tried below before the Hon. George McCormick.

The appellants were jointly indicted for the murder of one Davis Green, in Colorado county, Texas, on March 24, 1888. They were jointly tried under that indictment, and jointly convicted of assault with intent to murder, and each was awarded a term of two years in the penitentiary.

John Winslow was the first witness for the State. He identified the defendants as the parties named in the indictment, and stated that he knew Davis Green who was killed at Vineyard & Frazar's store, about six miles below Eagle Lake, in Colorado county, Texas, on —— day of ——, 1888. The witness's father, Dennis Winslow, was killed at the same time and place. Davis Green got to playing with some of the boys near the bar room part of the said store, and finally went to his horse, which was hitched near by, and got his Winchester gun from the scabbard, which was attached to the saddle. He did not cock the gun, but told Jack Williams not to approach any nearer to him than he then was. Soon after that, the witness got into his hack and called to deceased to go home with him. Deceased was then sitting on his horse in front of the saloon. Witness then drove a few steps towards home, his father, on horseback, riding along side of the hack. Witness then looked back and saw Mr. McDow step out of the bar room. McDow approached deceased from behind and seized the gun. A strug-

gle for possession of the gun then ensued between McDow and deceased, and during the struggle the gun was discharged, shooting McDow, who fell to the ground. Deceased then started off towards his house. The defendants, Moore and Dowing, standing at or near Vineyard & Frazar's store, opened fire on deceased as he rode off, Moore shooting with a pistol. As Mc-Dow fell on his back the gun of the deceased fell across his body. McDow exclaimed: "Kill the d—d son of a bitch," and the defendant Lehman ran up to McDow, seized the gun of the deceased, and opened fire on the deceased as he rode off. Deceased rode about one hundred and twenty yards, when he fell. The shooting occurred between five and six o'clock in the evening, and the deceased died the same evening. He was shot entirely through the body, the ball entering his back. The witness's father had nothing whatever to do with the difficulty, but was shot and killed. He (witness's father) was in the bar room before the shooting occurred, and bought a bottle of wine for sacramental purposes. That bottle was tied behind his saddle when he was killed. Witness saw Dowing and Lehman in the bar room before the shooting. Dowing was a bar keeper and worked in that capacity for Vineyard & Frazar. Lehman was a blacksmith, and was in the employ of Vineyard & Frazar. Before he mounted his horse, after telling Jack Williams not to approach him, the deceased put his gun back in the scabbard. When he got on his horse he took the gun across his lap, and so held it with the muzzle pointing towards the bar room. A rope attached to the pommel of the saddle was wrapped around the gun when McDow seized it. The rope broke during the struggle, and was dragged off by McDow as he fell.

Cross-examined, the witness said that he was in his hack, going towards his home, when McDow was shot and fell. His father was on horseback riding in the same direction. Deceased started off over the same route, when McDow was shot and fell. They were all traveling east through a lane. As soon as the shooting by the defendants commenced, the witness turned to the side of the lane to get out of range of the bullets. He stopped his hack and saw all that occurred. He called to his father to go home, when the first shot was fired, in order to avoid being killed. Witness remained in the hack until his father was shot. His father fell about a hundred steps distant from where McDow fell. He was shot in the leg above the knee, from behind, and bled a great deal. He did not break his neck by falling from

his horse. The deceased was not quarreling with Jack Williams in front of the bar room just before McDow was shot. He did not cock his gun nor point it at said Williams. About the time that deceased got his gun from the scabbard, the witness drove his hack a few steps and then stopped and turned to call deceased to go home. The next thing he saw was McDow holding one end of the gun, trying to get it away from deceased. McDow did not discharge the gun. The gun fell across McDow's body after McDow fell. Lehman rushed up at once, seized the gun and fired two shots at deceased as the latter rode off. Witness did not shelter himself in the bed of his hack, but sat quietly in the hack until his father was shot, when he went to him. Witness did not see the defendant (Moore) in the bar room when he saw Dowing and Lehman in there, just before the shooting, but, while his father was in the saloon buying the bottle of wine, he saw Moore standing on the gallery of the store. The said store faced the bar room and was about forty steps north of it.

Thornton Morton was the next witness for the State. He testified that he was at Vineyard & Frazar's store, in Colorado county, at the time that Davis Green and Dennis Winslow were killed. He was in the bar room a few minutes before the shooting took place, at which time Dowing, tending bar, and Lehman, standing about, were in the room. Quite a number of other colored people besides the witness were then in the bar-room. Hearing a noise outside and in front of the bar room, the witness went to the gallery to see what it was. He then found that the deceased and Andy Mason were engaged in a fuss. Jack Williams interposed to prevent a fight, and tried to persuade the deceased to go home. Deceased then went to his horse, got his Winchester from the scabbard, which was attached to the saddle, and told Williams not to approach him. Presently the deceased got on his horse and was holding his gun on the saddle, cross ways in front of him, when McDow, coming from the store, approached deceased from the rear and seized the end of the gun. The gun became entangled in a rope that was attached to the pommel of the saddle. Deceased kicked his horse, the horse plunged forward, the gun was discharged, and McDow fell to the ground, wounded, the gun falling near him. Deceased then rode off, and Moore, who was standing between the store and the saloon, opened fire on him. Lehman then ran to where McDow was lying, seized the de-

ceased's gun and attempted to shoot it, but, failing;, handed it to Dowing, who fired it at deceased. Lehman them drew a pistol and fired at deceased with it. Deceased fell about one hundred yards from where McDow fell, and Dennis Winslow fell about twenty yards further from that point. Moore fired five or six shots, Lehman three or four, and Dowing two. McDow did not fire a shot. Jack Williams and the deceased were cousins. Lehman made the first attempt to shoot with deceased's gun. Failing, he handed it to Dowing. Dowing fired two shots and deceased fell. Dowing then remarked to Lehman:. "You tried to get him, but I got the d—d son of a bitch."

On his cross examination, the witness said that the deceased and Andy Mason were not playing when he saw them in front of the saloon just before the shooting. Deceased did not cock his gun when he told Jack Williams not to come any nearer to him. Deceased may have had a few drinks at the time of the tragedy, but was not drunk. When the shot that wounded McDow was fired, witness sprang off the saloon gallery and secreted himself behind a corner of the same, from which, by peeping, he witnessed the whole of the ensuing transaction. The deceased had never had a difficulty with either of the defendants that the witness had ever heard of. Denis Winslow, who was the brother-in-law of witness, had no quarrel, fuss or disagreement with anybody on that day. He started home just before the shooting commenced, riding horseback, and following the hack which was driven by his son John. Dennis Winslow bought a bottle of wine from Dowing, in the saloon, and had it tied behind his saddle when shot. Witness did not see the defendant Moore in the bar room on. that evening. Witness did not know where Lehman got the pistol which he used after he failed with the gun and gave it to Dowing. He began to shoot the pistol as soon as Dowing took the gun.

J. U. Frazar was the next witness for the State. He testified that he was the junior member of the firm of Vineyard & Frazar, proprietors of the store and saloon, in Colorado county, near which the killing of Davis Green occurred. Deceased and Dennis Winslow came to the store perhaps an hour before the shooting occurred. The store house on the north and the saloon on the south face each other, about thirty-five steps apart. An eighty feet wide lane led off east from the store and saloon. At the time and for some time before the shooting commenced, the witness was standing on the west side of his store, a little south

of the center, or perhaps thirty feet from the corner of the said store, talking to Henry Garner. The deceased's horse, to the saddle on which his Winchester in the scabbard was attached, was hitched to a tree about twenty-five steps northwest from the bar room. The deceased, who, as the witness thought, got his whisky at Eagle Lake before coming to the store, was drinking at the time of the shooting. While talking to Garner, as stated, the witness heard the deceased quarreling with Jack Williams and Andy Mason. Deceased finally ran to his horse, got his Winchester, cocked it and covered Jack Williams with it, and said to him: "God d—n you, if you come any further I will kill you." Williams, who was the brother-in-law of the deceased, stopped and said to him: "Davis, you wouldn't shoot me, would you?" Deceased, who appeared to be angry, then mounted his horse and rode to a point immediately in front of the bar room, accosted Andy Mason, who was standing in the door, and said to him: "D—n you, what have you got to do with it?" At the same time he threw his gun down on Mason, the muzzle of the gun pointing directly towards the door of the saloon. Mason replied that if deceased, who was then about ten feet from the gallery, would put down his gun, he, Mason, would whip him. About that time Mr. Arthur McDow stepped out of the saloon, on his way to the store. Passing near the deceased, McDow seized the gun by the barrel, near the muzzle, and attempted to wrest it from the deceased. A struggle for the possession of the gun ensued between McDow and the deceased, during the progress of which the gun was discharged, and McDow fell to the ground wounded, the gun falling at the same time. It was the opinion of the witness that the deceased kicked his horse at the time the gun fired; at any rate, the horse started off, and immediately five or six shots were fired from different directions. Witness did not know who fired any of those shots, there being at least a hundred people on the ground at the time. The people scattered in every direction when the firing commenced. The witness saw only the one shot that was fired by the deceased, and knew that to be the only shot that the deceased fired. Witness did not see a shot fired by either McDow, Dowing, Moore or Lehman. The witness directed his attention more particularly to McDow, but did not see McDow all of the time. The witness, who was the first person to reach McDow after he fell, reached him about five minutes after he was shot. Henry Franklin, a negro, reached him a few moments

later.  McDow was lying down, resting on his elbow, with his unwounded leg doubled up under him, when the witness reached him.  He had not changed the position into which he fell after being shot.  There was no gun near McDow, and it was evident that McDow could not have fired any of the shots.  The witness had no recollection of seeing either Lehman or Dowing during the shooting.  Moore came to McDow soon after the witness reached him, and helped Franklin to carry McDow to Lehman's house, which was near by.

Cross examined, the witness said that the crib and lot of Mr. Finch, near and east of the bar room, project about fifteen feet into the lane.  A person standing on the west side of the bar-room and looking around the corner of the said crib, could see parties in front of the store and saloon, but could not see down the lane any appreciable distance beyond these points, nor could the person looking from the corner of said crib see the points in the lane where deceased and Dennis Winslow, or either of them, fell.  Deceased fell about one hundred yards distant from the saloon, and Winslow about twenty-five yards further down the lane.

Jack Williams testified, for the State, that he was at Vinyard & Frazar's store on the evening of the shooting and killing of Davis Green and Dennis Winslow, but was not present when any of the shots were fired, and did not know who fired any of them.  A few minutes before the tragedy the deceased, who was witness's brother-in-law, and who was drinking, provoked a quarrel with witness, which culminated in the deceased striking witness in the face with his hand, causing witness's nose to bleed.  Deceased then went to his horse, which was hitched near the bar room, got his Winchester, cocked it, and drew it on witness, remarking to him: "God d—n you, if you come any further, I will kill you."  Witness, who was not afraid that deceased would shoot him, said to him: "Davis, you wouldn't shoot me, would you?"  Witness then asked deceased to get on his horse and go home.  Deceased got on his horse and rode off towards the saloon.  Witness went into the store, and saw nothing that afterwards transpired.

Henry Franklin testified, for the State, that he was at Vinyard & Frazar's store and saloon at the time of the killing of the deceased and Winslow.  He was in the saloon when the dispute began between deceased and Andy Mason.  He then stepped from the saloon to the gallery, and saw the deceased on

his horse in front of the gallery on which Mason was standing. He heard Mason tell deceased that if he would put up his gun, he, Mason, would whip him. About that time Mr. McDow stepped out of the bar room and stated towards the store. As he went to pass deceased he seized the deceased's gun by the muzzle, and in the struggle for the gun that ensued the gun was discharged, and McDow fell. Witness fled immediately into the saloon, and saw nothing of the subsequent proceedings, and did not know who fired any of the several shots he heard. As soon as the shooting was over, the witness went to where McDow was lying. No person had yet reached McDow, but Mr. Underwood Frazar soon came. There was no gun near Mr. McDow when witness reached him. Witness, Moore and others then carried McDow into Lehman's house.

The State closed.

Arthur McDow was the first witness for the defense. He testified that he and defendant Moore rode together from Eagle Lake to Vineyard & Frazar's store on the fatal evening, reaching the latter point between four and half past four o'clock. Moore stopped at the blacksmith shop, a short distance from the store, and witness rode on to a tree near the saloon, where he hitched his horse. From that point he went to the bar room. The said bar room and store, facing each other, mark the western terminus of a lane that is several hundred yards in length. When he went into the said saloon he saw Lehman standing about, and saw Dowing behind the counter, waiting on customers. After he had been in the saloon for a short while he overheard a quarrel between some parties on the gallery outside. A few moments later he left the saloon to go to the store. As he stepped off the saloon gallery he saw a negro sitting on a horse with a Winchester rifle in his hands. As witness stepped forward, to pass around the horse, the negro threw his gun over and the gun was discharged. Witness was satisfied that the negro (deceased) shot at him, as the ball passed near his shoulder. At any rate, the negro "broke" the gun and threw another cartridge into the magazine, and then covered witness with the gun. Witness seized the gun barrel near the muzzle and attempted to push it away, so that if it was again discharged it would not shoot him. He pressed it down and was trying to turn it aside, when deceased fired it again, and the ball took effect in the witness's thigh near the hip joint. Witness clung to the gun, and deceased kicked his horse to make him go. The

animal dragged the witness about fifteen feet, when the deceased's hold on the gun gave away and witness and the gun fell to the ground. Witness fell in a sitting posture, his wounded leg stretched out in front of him and his unharmed leg doubled up under him. As soon as he fell the witness opened fire on deceased with the gun he had taken from him, firing two, and he thought three shots. He emptied the magazine of the gun, whether it was two or three shots that he fired. Witness neither heard nor saw any other shots fired than those fired by himself and the deceased. He did not know the deceased, and never heard his name mentioned until after he was killed.

After the shots were fired by the witness, Lehman came up behind the witness, and seized and tried to take the gun. Taking him to be one of the negroes, the witness at first refused to surrender the gun, but, finding out presently who he was, witness released the gun. Lehman did not and could not have fired a shot from that gun, because it was empty when he got it. The deceased was riding off rapidly when the witness fired the several shots at him. He was about twenty-five steps distant from witness when witness fired his first shot. He appeared to be drunk. Quite a large number of negroes were about the store and saloon when the shooting occurred. No words passed between the witness and deceased at any time. Immediately after the witness's first shot, at which time deceased was riding east down the lane, the deceased leaned forward on or toward the pommel of his saddle, as if he had been shot, but witness was unable to say whether the ball took effect or not. Witness had seen Dennis Winslow before that day, but had no acquaintance with him. The defendants and the witness were all friendly. The shooting occurred on Saturday, the day on which the negroes were in the habit of collecting in large numbers at the store and saloon. The witness did the larger part of his trading at Vineyard & Frazar's store, as did the defendant Moore. The witness leaned back on his elbow as soon as he surrendered the gun to Lehman—the bone in his thigh being badly shattered. On the morning after the shooting, the physicians, Doctors Davidson and Norris, having informed him that he would die—which witness did not believe—he made an affidavit before Judge Zeigler detailing the facts of the transaction substantially as he has now stated them. The witness did not see the defendant Moore after leav-

ing him at the blacksmith shop, until after the shooting. J. U. Frazar was the first person who reached the witness after the shooting. The wound confined the witness to his bed about four months.

On his cross examination, the witness said that he did not remember at whose instance he made the affidavit referred to in his evidence in chief. Mr. Duke and Mr. Eldridge were in the room when he made the affidavit, but neither of the defendants were there. He did not remember who went after the justice of the peace to take his deposition. Witness had no recollection that he ever said to Sheriff Townsend that there "was so d—d much shooting at the time that he could not tell who did shoot." Witness denied that he ever, at any time, told Sheriff Townsend or anybody else that he, witness, "had told several different stories about the shooting, and could tell a d—d sight more." Witness did not say that he shot at deceased while leaning back on his elbow. He said that he leaned back on his elbow after Lehman got the gun away from him. Witness was not drunk at the time of the shooting, but morphine was administered to him after he was shot, and he was kept under the influence of that narcotic several days. The witness did not recollect that he bought anything from Vineyard & Frazar's store on that day, and did not recollect that he stated in his affidavit that he made any purchases on that day.

John Finch testified, for the defense, that he was standing a short distance from, and in front of, the store when the difficulty first began which resulted in the killing of deceased. It began in a dispute between deceased, Jack Williams and Andy Mason. Witness saw the deceased get his gun from his saddle, cock and present it at Jack Williams, and heard him tell Jack Williams that he would kill him if he advanced any further towards him. Deceased was then both angry and drunk. The witness then turned into the store, and was in there when the several shots were fired. He heard the shots, but did not see them fired, and did not know who fired them. Very soon after the shooting, the witness stepped to the store gallery and saw several parties standing about McDow, but could not say who any of them were. The witness was well acquainted with each of the defendants, and with their respective reputations in the community for peace or violence. Each of them was reputed to be a quiet, peaceable man.

On his cross examination, this witness stated that he had

heard of rows in which the defendant Moore had been engaged prior to the killing of the deceased, and that indictments therefor were pending against him. Lehman and Dowing lived near the Vineyard & Frazar store. Moore was in the employ of James A. Frazar. The witness testified before the grand jury that presented this indictment, but did not remember that he then testified that he saw each of the defendants with McDow after he had fallen.

J. U. Frazar, recalled by the defense, testified that he was well acquainted with the reputation of each of the defendants for peace or violence. Each was reputed to be a quiet, peaceable man. Cross examined, the witness said that he had known defendants Lehman and Dowing about four months at the time of the killing, and the defendant Moore about three years. Witness had heard of Moore having difficulties, and of indictments being found against him, but had never heard him spoken of as a violent or dangerous man.

B. L. Vineyard testified, as did the witness Frazar, regarding the reputation of the defendants for peace or violence, and, in addition, that he was not at his store or saloon on the evening of the killing, and knew nothing about it.

On his cross examination, he said that he knew of the defendant Moore having difficulties and of being indicted therefor. He had no knowledge of Moore being regarded generally as a dangerous man, but he did know that nearly all the negroes in the community were afraid of him, and that some people looked upon him as a dangerous man, while others did not.

H. C. Cabiness testified, for the defense, that he had known the defendant Moore about three years, and the defendants Lehman and Dowing about four months. At the time of the killing, the reputation of each of them was that of a quiet, peaceable man. He had never heard that Moore was a violent or dangerous man, but had heard that indictments were pending against him in this court.

The clauses of the requested instruction, specially referred to the opinion, and which are the subject matter of the ruling announced in the second head note of this report, read as follows:

\* \* \* "1. If you find the defendants, or either or any of them, not guilty of murder, under the charge heretofore given you, you should acquit him or them of that offense, and may in that case, if you see proper, proceed to inquire whether or not they, or any of them, is guilty of manslaughter.

"2. Manslaughter is voluntary homicide committed under the immediate influence of sudden passion, arising from an adequate cause, but neither excused nor justified by law.

"3. To reduce an unlawful killing from murder to man-slaughter, it must be done under the influence of sudden passion, and there must have been an adequate cause for such sudden passion.

"4. By the expression, 'under the influence of sudden passion,' is meant that the provocation for the passion must arise at the time of the killing; for, if such passion is the result of a former provocation, such killing would be murder and not man-slaughter; and the killing, to reduce murder to manslaughter, must be directly caused and done under the influence of sudden passion arising out of such provocation for the passion.

"6. The passion intended to be explained above is either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection.

"7. What constitutes an adequate cause for such sudden passion in the mind of the slayer as will reduce an unlawful killing from murder to manslaughter is meant such cause for such passion as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render him incapable of cool reflection; for, if the mind of the slayer is cool and he reflects upon the result of his actions, then an unlawful killing would be murder and not manslaughter.

"8. If, therefore, you find from the evidence that the defendants, or either or any of them, as charged in the indictment, did unlawfully kill Davis Green, and that such killing would be manslaughter, as manslaughter has been hereinbefore defined, you will find him or them guilty of manslaughter, and assess the punishment at confinement in the penitentiary for any term of not less than two years and not more than five years."

No brief for the appellants.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Under an indictment for murder, appellants have been jointly tried and convicted of assault with intent to murder, the punishment of each being assessed at two years in the penitentiary.

"In order to constitute the offense of assault with intent to murder, two things must concur, first, an assault, and, second, a specific intent to kill. Without a simultaneous concurrence of these two constituent elements there can be no assault to murder. No intent save the specific one to kill will be sufficient." (Willson's Crim. Stats., sec. 857; McCullough v. The State, 24 Texas Ct. App., 128.)

In this case the charge of the court instructed the jury: "If, therefore, you find from the evidence that the defendants, or either of them, fired upon the deceased with a deadly weapon, with the intent to kill *or do him such serious bodily injury as would probably end in death,* and that if they or either of them had killed the deceased, such killing would have been murder, as murder and malice is hereinbefore defined," then where death did not ensue, they would be guilty of assault with intent to murder. No correction of this error is found in any other portion of the charge.

It was also a question of fact in this case, to be ascertained by the jury, as to the existence or non existence of such adequate cause as would reduce the killing from murder to manslaughter. If defendants, seeing their friend shot down, were so aroused by sudden rage or resentment as that their minds were incapable of cool reflection, and, acting under the immediate influence of such sudden passion, they shot and killed the deceased, their offense would have been manslaughter, and not murder. A charge to this effect was asked in behalf of defendants, and a bill of exceptions was reserved to the refusal of the court to give it.

For the errors in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 31, 1888.